UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal No.  09-184-B-W |
| | ) |
| BENJAMIN JAMES SMALL, | ) |
| | ) |
| Defendant. | ) |

**MOTION TO DISMISS INDICTMENT
WITH INCORPORATED MEMORANDUM**

The defendant, Benjamin Small, by and through his attorney, respectfully moves the court for an order dismissing the Indictment in the above-entitled matter on the grounds that deprivation of Mr. Small's Second Amendment rights based on a "blue paper" rather than a formal commitment hearing deprives him of an individual constitutional right in a manner that does not withstand intermediate scrutiny.

Mr. Small also moves to dismiss because the procedure employed by the State of Maine that is considered a "commitment" pursuant to First Circuit precedent does not provide adequate notice to a person of average intelligence that they are prohibited from possessing a firearm, and therefore the federal statute is impermissibly vague in the context of the present proceeding.

This motion is made pursuant to the Second Amendment and Fifth Amendments to the United States Constitution and Federal Rule of Criminal Procedure 12(b)(2).

## THE ALLEGATIONS CONTAINED IN THE INDICTMENT

Mr. Small has been charged by way of a one-count Indictment which reads:

> On or about March 23, 2009 in the District of Maine, the defendant,
> **BENJAMIN JAMES SMALL,**
> having been committed to a mental institution did knowingly possess in and affecting interstate commerce a firearm, that is, a .357 Astra magnum revolver, serial no. R198770, In (sic) violation of Title 18, United States Code, Sections 922(g)(4) and 924(a)(2).

Mr. Small made his initial appearance on this charge on December 4, 2009 and entered a plea of not guilty.

## FACTUAL BASIS FOR MOTION

The Government provided through discovery evidence that it will intend to prove the element that Benjamin Small was "committed to a mental institution" by was of a State of Maine Application for Emergency Involuntary Admission to a Mental Hospital (Blue Paper), filed on May 2, 1998 and May 27, 1998.  The form is reviewed only as to regularity, but not as to content, and in Mr. Small's case, both Blue Papers are signed by a Justice of the Peace.  *See* Def. Ex. A (Blue Paper dated 5/2/1998) and Def. Ex. B (Blue Paper dated 5/27/1998).[1]  There is no evidence that, pursuant to these Blue Papers, Mr. Small was ever informed that he was thereafter prohibited from possessing a firearm.

Mr. Small purchased the firearm charged in the Indictment in a private purchase. Discovery provided by the Government indicates that Mr. Small entered an establishment

---

[1] The exhibits to this motion are being filed under seal, given the non-public nature of these documents.

called "Kennebec Guns" while a man was inquiring of the proprietor (a federally licensed firearms dealer) regarding the value of the gun.  Mr. Small expressed interest in purchasing the firearm and the transaction between the private parties was assisted by the Dealer.  No impropriety regarding the sale of the firearm is indicated in the Discovery.  There is no criminal conduct alleged with respect to Mr. Small's possession of the firearm, other than the allegation that his status precludes such possession.  It was recovered from his home and he did indicate to police that he possessed it for self-protection.

## LEGAL BASES FOR MOTION

**A.     18 U.S.C. § 922(g)(4) is unconstitutional under the Fifth Amendment as applied in this case:**

Title 18, United States Code, Section 922(g)(4) proscribes the possession of a firearm by any person "who has been adjudicated as a mental defective or who has been committed to a mental institution."  Mr. Small  moves to dismiss the Indictment on the basis that this statute is unconstitutionally vague as applied in the circumstances of this case.  Mr. Small never received notice that he was a prohibited person, and the laws of Maine do not establish that a Blue Paper proceeding comports with the Due Process requirements of a legitimate "commitment to a mental hospital," a requirement that is met through other proceedings in the State of Maine to which Mr. Small was not subject.

To illustrate this point, it may be useful to use as an example the method of

involuntary commitment within the federal prison system and its evolution with respect to involuntary mental commitments. The involuntary commitment of a person who is in the care and custody of the Attorney General pursuant to a criminal conviction currently is found at 18 U.S.C. § 4245. Section 4245 as we know it today was enacted as part of the Comprehensive Crime Control Act of 1984 (CCCA), Pub. L. No. 98-473, 98 Stat. 2062 (1984). Prior to the enactment of the CCCA, federal law provided that, upon the report and recommendation of a board of examiners, an inmate could be transferred to a psychiatric hospital at the direction of the Attorney General. *See* S. Rep. No. 225, 98th Cong., 2nd Sess. 1, 248 *reprinted in* 1984 U.S. Code Cong. & Ad. News 3182, 3430. Congress decided to change the law to require an adversarial hearing in reaction to the Supreme Court's opinion in *Vitek v. Jones*, 445 U.S. 480 (1980). *See* S. Rep. 225 at 247 *reprinted in* 1984 U.S. Code Cong. & Ad. News at 3429.

    *Vitek* was brought as a due process challenge to a Nebraska statute which allowed the Director of Correctional Services to transfer a prisoner to a mental hospital if a designated physician or psychologist found the prisoner to be suffering from a mental disease or defect that could not be given proper treatment in the facility in which the inmate was incarcerated. The Supreme Court recognized that, for an ordinary citizen, confinement in a mental hospital presents a "massive curtailment of liberty," but that an imprisoned person was already subject to confinement. *Vitek*, 445 U.S. at 491-492. However, the Court recognized that the "loss of liberty produced by an involuntary

4

commitment is more than a loss of freedom from confinement." *Id*. at 492.

The Court identified being free from the stigma of a mental commitment as one type of liberty interest involved, as well as freedom "from ... unjustified intrusions on personal security." *Id.*, *citing Ingraham v. Wright*, 430 U.S. 651, 673 (1977). Such an intrusion would result from "[c]ompelled treatment in the form of mandatory behavior modification programs... ." *Vitek*, 445 U.S. at 492. The Court then held that:

> Were an ordinary citizen to be subjected involuntarily to these consequences, it is undeniable that protected liberty interests would be unconstitutionally infringed absent compliance with the procedures required by the Due Process Clause. We conclude that a convicted felon also is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital.

*Id*. at 492-493. It is these procedures that are required by the Due Process Clause that are at issue here.

The Due Process rights identified by the Supreme Court that adhere to a person subject to a commitment to a mental hospital are as follows:

A. Written notice to the prisoner that a transfer to a mental hospital is being considered;

B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;

C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except *495 upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;

D. An independent decision-maker;

  E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;

  F. Availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own; and

  G. Effective and timely notice of all the foregoing rights.

*Vitek*, 480 U.S. at 495. Exhibits A and B do not provide any of these necessary procedures.

  Mr. Small moves to dismiss the Indictment on the basis that the evidence the Government has provided regarding his commitment proceedings do not afford sufficient due process to support a finding of a "commitment" pursuant to federal law. Defendant understands that the First Circuit held in *United States v. Chamberlain*, 159 F.3d 656 (1st Cir. 1998) that the Maine "blue paper" procedure was sufficient to support a finding of a mental commitment pursuant to 18 U.S.C. § 922(g)(4). In that case, the First Circuit was presented with a case in which the defendant had previously been emergently admitted to a mental health hospital, but was not committed pursuant to the procedures provided by the laws of the State of Maine. The Court decided that an emergency admission was the equivalent of an involuntary commitment for purposes of 18 U.S.C. § 922(g)(4). The manner in which it did so is important to understand.

  The Defendant in *Chamberlain* did argue to the First Circuit that the procedure set out for an emergency admission pursuant to a "Blue Paper" was not the equivalent to a "commitment" for purposes of § 922(g)(4). The *Chamberlain* court rejected this

argument by finding that Congress had not defined the term "commitment" and that the dictionary meaning of that term renders an "'involuntary admission' under section 3863" to "seem no different from a 'commitment.'" *Id.*, 159 F.3d at 661. The Defendant then relied on the Rule of Lenity rather than on the Due Process Clause in explaining why a "Blue Paper" is different from an Emergency Admission on a constitutionally significant basis. In other words, the First Circuit entirely missed the fact that the Supreme Court had held that there can be no constitutionally valid "commitment" without the notice, appointment of counsel, and right to cross examination set forth in *Addington v. Texas*, 441 U.S. 418 (1979) and later re-affirmed in *Vitek*, *supra*. In *Addington*, the Supreme Court indicated that the question as to whether an individual is mentally ill "turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." *Id.*, at 429. What the *Chamberlain* court did not account for was the Supreme Court's admonition that the medical nature of the inquiry does not justify dispensing with due process requirements. It is precisely "[t]he subtleties and nuances of psychiatric diagnoses" that justify the requirement of adversary hearings before a person can be "committed" to a mental hospital. *Addington*, 441 U.S. at 430.

It is because the Supreme Court has supplied the definition as to what a constitutionally permitted "commitment" must involve, as opposed to the definition provided by the First Circuit in *Chamberlain* that renders the statute impermissibly vague. The difference may be understood by the analysis provided by the Second Circuit in

*United States v. Waters*, 23 F.3d 29 (2nd Cir. 1994). In that case, the Court construed the laws of the State of New York and found that, because they allowed for an adversarial hearing if a person who had been emergently admitted to a mental hospital desired, the statute was constitutional. However, because New York considered a person who had been emergently admitted, but who never requested a hearing to challenge that admission, as being "committed" to a mental hospital, that the procedure qualified as a "commitment" for federal statutory purposes. *See id.* at 32-36. The Second Circuit noted that two other circuits, had relied on state law procedures that separated emergency admissions from formal commitment proceedings (as does Maine) and had found that a person emergently admitted but not later subject to an adversary hearing did not meet the federal definition of "commitment." *See id.* at 31, *citing United States v. Giardina*, 861 F.2d 1334, 1335 (5th Cir.1988); *United States v. Hansel*, 474 F.2d 1120, 1122-23 (8th Cir.1973).

  The difference in these opinions from that in *Chamberlain* is the reliance on state law that comports with the requirements of the Due Process Clause before a person can be deemed to have been "committed." To construe the statute to refer to those procedures created by state law that are not intended to meet the constitutional minimum procedural protections that must be complied with in a commitment proceeding renders the meaning of "commitment" constitutionally vague. Because a "Blue Paper" in Maine does not provide the procedures needed to comply with the Due Process Clause, basing the instant

8

prosecution on a procedure that was neither intended to nor would be recognized as a valid method of "commitment" to a mental hospital renders the term meaningless. It also fails to give a person adequate notice of what constitutes a valid "commitment" for purposes of the federal gun prohibition. Therefore, § 922(g)(4) is unconstitutional as applied in this case.

**B.     Section 922(g)(4) is unconsitutional pursuant to the Second Amendment as applied in this case**

The basis for the First Circuit's decision in *Chamberlain* did not take into account something that could not have been foreseen at the time, but is true now: the Supreme Court has conclusively decided that the Second Amendment confers an individual right to keep and bear arms. *See Heller v. District of Columbia*, 128 S.Ct. 2783 (2008). The question *Heller* raises in the instant proceeding is the level of process that is due before a person is labeled as one who, due to mental incapacity, has lost an individual right otherwise conferred by the Constitution.

The United States Supreme Court has recognized the importance to the individual of avoiding the stigma attached to having been involuntarily committed to a mental hospital. *See Addington, supra*. To avoid that stigma, as well as the intrusions into personal liberties associated with such detention, the Supreme Court has recognized that certain procedures must be afforded to those whom the State believes are in need of involuntary commitment. Those procedural protections were never provided to Mr. Small. Therefore, he never had an opportunity to challenge whether he was within that

class of persons that Congress sought to preclude from possessing a firearm, and that Congress could preclude from so doing because a hearing had been conducted in which that person's right to be protected from arbitrary intrusion into the rights one otherwise possesses by means of a mental health commitment proceeding.

In order to understand the Second Amendment argument, it must be understood that Congress did not seek to prohibit any person who had ever had a mental health diagnosis from possessing a firearm. Rather, the proscription is narrowed to those who have been either adjudicated mentally deficient or "committed" to a mental health hospital. *See* 18 U.S.C. § 922(g)(4). Here, we are not dealing with incompetence, but rather whether Mr. Small was "committed" within the meaning of the statute. The Second Amendment question arises where § 922(g)(4) is deemed to reach those who have never had a right to a hearing on whether they qualify to be committed to a mental hospital.

To counsel's knowledge, the only circuit court to consider the impact of the Second Amendment as an individual right on Section 922(g) in the context of prohibitions other than those listed in *Heller* is in *United States v. Skoien*, 2009 WL 3837316 (7th Cir. Nov. 18, 2009). In that case, the Seventh Circuit reversed a district court decision denying a motion to dismiss based on a Second Amendment challenge to 18 U.S.C. § 922(g)(9), which proscribes firearm possession by those convicted of a misdemeanor crime of domestic violence. The Court found that the Government bore the

burden of establishing an adequate fit between the proscription and the infringement of the Second Amendment right at issue. It did so because it found that "intermediate scrutiny" was the appropriate level of review for this type of challenge to Section 922(g). *See id.* at *7. It is interesting to note that the Court did so based on the nature and use of the firearm, which in that case was a long rifle intended to be used for hunting. Here, Mr. Small possessed a revolver for self-defense in his home. This use is more closely tied to the core Second Amendment interest identified in *Heller*, and therefore may require a more intense level of scrutiny.

In defining what this level of scrutiny entails, the Court indicated that in "[a]pplying it, we need not spend much time addressing whether reducing domestic gun violence qualifies as an important governmental interest; the Supreme Court has already held that it does ... . The disputed question here is the relationship between the government's means and its end-whether there is a 'reasonable fit' between the perpetual disarmament of domestic-violence misdemeanants and the important goal of preventing gun violence against domestic intimates." *Id.* at *9.

In this case, the question becomes whether there is a "reasonable fit" between the "perpetual disarmament" of those who have not been afforded an opportunity to challenge whether they are in need of involuntary commitment, as mandated by the Due Process Clause. This mandate stems from the notion that "[a]t one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a

mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement." *Addington*, 441 U.S. at 427. Absent a hearing at which Mr. Small was afforded the opportunity to establish whether he falls within that class of persons who can be involuntarily committed to a mental hospital, we will never know whether the commitment simply stemmed from a legitimate intrusion into his liberty (and deprivation of rights) and one that is otherwise forbidden. Unless the Government can produce evidence that those who are *not* committed after an opportunity to be heard before a neutral fact-finder present the same danger as those who are, then construing the statute to reach those who have never had an opportunity to be heard on the matter violates the Second, as well as the Fifth, Amendments.

Mr. Small did not engage in any misconduct with the firearm charged in the Indictment. He has no prior criminal history. He had no notice that he had his Second Amendment rights abrogated. He was afforded no hearing in which to contest the basis for abrogating his rights. To convict him of a felony in such circumstances should be based on some prior determination that he falls within that class of persons whom Congress targeted in creating § 922(g)(4), and that this class of persons is sufficiently circumscribed as to not include those who do not present the same type of danger as those who have been committed to a mental hospital after having been afforded notice, a hearing, and an ability to contest the propriety of such commitment.

## CONCLUSION

Based on the foregoing, Defendant requests that his motion to dismiss the Indictment be granted.

Dated: December 18, 2009

Respectfully submitted,

*/s/ Virginia G. Villa*

_____
VIRGINIA G. VILLA
Assistant Federal Defender
Key Plaza-Second Floor
23 Water Street
Bangor, ME 04401
(207) 992-4111

Attorney for Defendant


Certificate of Service

I, Virginia G. Villa, attorney for, hereby certify that on December 18, 2009, I electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

James M. Moore, Assistant U.S. Attorney.

/s/ *Virginia G. Villa*
Assistant Federal Defender